T.C. Memo. 2000-190

UNITED STATES TAX COURT

MICHAEL H. GULLEY AND PAULA M. GULLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15606-97.                    Filed June 27, 2000.

<u>Elizabeth A. Copeland</u> and <u>Stanley L. Blend</u>, for petitioners.

<u>Rosemary Schell</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes as follows:

| Year | Taxpayer(s) | Deficiency |
|------|-------------|------------|
| 1993 | Michael H. Gulley | $3,671 |
| 1993 | Paula M. Gulley | 7,986 |
| 1994 | Michael H. and Paula M. Gulley | 68,321 |

Petitioner Michael H. Gulley (petitioner) owned a 66.67-percent general interest in the GSD limited partnership (GSD) in 1991. On July 11, 1991, petitioner filed a petition in bankruptcy, which petitioners contend caused GSD's tax year to end. GSD filed its final tax return on July 15, 1991, for the period January 1 to July 11, 1991. GSD had a loss of $1,459,349 for that period. Petitioner's distributive share of that loss was $972,899, causing a net operating loss (NOL) for 1991.

After concessions, the sole issue for decision is whether petitioner for 1993 and petitioners for 1994 may carry forward an NOL from 1991. Resolution of this issue depends on our resolution of the following issues:

1. Whether, under section 708(b)(1)(A) or (B), GSD terminated on July 11, 1991, as petitioners contend, so that GSD's loss for the period in 1991 before petitioner filed his petition in bankruptcy is allocated to petitioner and not his bankruptcy estate, or in 1992, as respondent contends. We hold that GSD terminated in 1992.

2. Whether, as petitioners contend, under section 706(c)(2)(A), GSD's tax year closed as to petitioner on July 11, 1991, causing GSD's tax items, such as the interest on the Sunbelt note that accrued from January 1 to July 11, 1991, to be allocated to petitioner, rather than to his bankruptcy estate. We hold that it did not.

3. Whether, as petitioners contend, under section 706(d), GSD's loss for 1991 is allocated pro rata to petitioner from January 1 to July 11, 1991, and to his bankruptcy estate and Martha Johnston from July 12 to December 31, 1991. We hold that none of GSD's loss for 1991 is allocated to petitioner.

4. Whether, as petitioners contend, the bankruptcy trustee abandoned the administration of the bankruptcy estate's GSD interest so that, under 11 U.S.C. section 554 (1988), the GSD interest reverted back to petitioner as if it had not entered the bankruptcy estate. We hold that the bankruptcy trustee did not abandon the GSD interest.

5. Whether any of the 1991 NOL survived after the NOL was reduced, pursuant to section 108, by the amount of cancellation of indebtedness income excluded from gross income. We hold that none did.

Unless otherwise provided, section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Petitioners were married in 1993 and lived in San Antonio, Texas, when they filed their petition in this case. Petitioner was married to Martha R. Johnston (Johnston) (formerly known as

Martha R. Gulley) from August 1965 to September 1992.
Petitioners used the cash method of accounting.

B.    GSD, Ltd.

   1.    Formation and Ownership--1984 to 1987

   In November 1984, petitioner, Jeffrey Schlesinger
(Schlesinger), J. Russell Davis (Davis), and Thomas J. Smith
(Smith) formed GSD, Ltd., a Texas limited partnership, to
acquire, own, operate, improve, maintain, and lease 1,850 acres
in Bexar County, Texas, known as the Encino Park project (Encino
Park).  GSD used the accrual method of accounting.

   Petitioner was the sole general partner of GSD.  He
contributed an earnest money contract for the purchase of Encino
Park in exchange for a 60-percent general partnership interest in
GSD.  GSD's limited partners were Schlesinger, who owned a 30-
percent interest; Davis, who owned a 9-percent interest; and
Smith, who owned a 1-percent interest.

   2.    The Sunbelt and Western Savings Loans

   In 1984, GSD sought to buy Encino Park for $64,286,008.  In
November 1984, GSD negotiated with Sunbelt Service Corp.
(Sunbelt) and Western Savings Association (Western Savings) to
borrow the money to buy Encino Park.  On November 29, 1984,
petitioner and Schlesinger guaranteed a $50 million loan from
Sunbelt to GSD, and petitioner signed (as GSD's general partner)
a promissory note payable to Sunbelt (the Sunbelt note).  The

note was recourse as to GSD.

On November 30, 1984, Western Savings lent GSD $38 million. Western Savings structured the loan as an $88 million wraparound mortgage that included the outstanding balance of Sunbelt's $50 million note.

GSD conducted development activities and made sales from the Encino Park project from 1984 to 1987.

### 3. GSD Ownership--1987 to 1991

In December 1987, Smith and Davis assigned their limited partnership interests in GSD to petitioner and Schlesinger. From December 1987 to January 1991, petitioner owned a 66.67-percent general partnership interest and Schlesinger owned a 33.33-percent limited partnership interest in GSD.

### 4. Encino Park Foreclosure and Sunbelt Note Litigation

The Sunbelt note matured on December 1, 1987. GSD did not repay the note at that time. Sunbelt treated the note as being in default, and, in January 1988, sued GSD, petitioner, and Schlesinger in Dallas County, Texas, district court. GSD, petitioner, and Schlesinger filed a counterclaim alleging that the foreclosure was wrongful on the grounds that the Sunbelt note was not a loan and that Sunbelt was a joint venturer in the project.

On February 2, 1988, Sunbelt foreclosed on Encino Park. On March 1, 1988, Sunbelt bought Encino Park for $30.4 million in

the foreclosure.  This left GSD, petitioner, and Schlesinger owing a balance of $27,742,833 on the Sunbelt note.  GSD continued to accrue interest on the Sunbelt note after foreclosure.  Sunbelt sought to collect from petitioner individually because he was GSD's general partner and had guaranteed the note.

In June 1988, GSD, petitioner, and Schlesinger sued Sunbelt in Federal District Court to recover Encino Park.  The plaintiffs alleged that the Sunbelt note and guaranty were not enforceable, that Sunbelt was a partner and joint venturer of Encino Park, and that the foreclosure was wrongful.  GSD, petitioner, and Schlesinger also filed notices of lis pendens against Sunbelt in November 1988 and September 1989 to ensure that Encino Park would not be sold before the court resolved their claims.  In February 1990, the State and Federal suits were consolidated in Federal District Court.

In May 1990, the State of Texas filed a condemnation action against Sunbelt, GSD, petitioner, and Schlesinger in State probate court.  The State of Texas ordered Sunbelt, GSD, petitioner, and Schlesinger jointly to make condemnation payments of about $1.8 million plus interest to the State probate court. In 1995, the condemnation proceeds were distributed to Sunbelt's successor in interest, the Resolution Trust Corp., in partial payment of the loan deficiency to Sunbelt.

5. Schlesinger's and Petitioner's Bankruptcies

In January 1991, Schlesinger filed a petition with the Bankruptcy Court for the Western District of Texas under chapter 11 of the U.S. Bankruptcy Code. On July 11, 1991, petitioner filed a petition with the Bankruptcy Court for the Western District of Texas under chapter 7 of the U.S. Bankruptcy Code.

Sunbelt tried to collect on the note until petitioner filed his bankruptcy petition. Petitioner was no longer liable on the Sunbelt note at the time of trial in the instant case.

On the schedules filed with the Bankruptcy Court in July 1991, petitioner listed as his personal property (among other things) the pending Federal suit against Sunbelt (exact value unknown), and his GSD partnership interest, which he valued at zero. Petitioner listed the following debts in his bankruptcy petition: Taxes he owed to other authorities ($3,512), secured claims ($534,000), and unsecured claims without priority ($60,060,294), including $23,535,000 for the Sunbelt note.

Under the GSD limited partnership agreement, the filing of the petition in bankruptcy by petitioner terminated the partnership.[1] Petitioner was granted a discharge in bankruptcy

---

[1] Secs. 13.1 and 13.1.2 of the GSD Limited Partnership Agreement state in pertinent part:

"The partnership shall terminate upon the * * * bankruptcy * * * of the General Partner * * * unless within (90) days after the effective date of such * * *

(continued...)

under chapter 7 on November 20, 1991. Petitioner's bankruptcy case closed in August 1993.

### 6. GSD's Final Partnership Return

GSD reported that interest accrued on the Sunbelt loan from its initial return in 1984 until its final return for 1991. GSD reported assets, loan balances, and accrued interest on its 1988, 1989, 1990, and 1991 Forms 1065, U.S. Partnership Return of Income, as follows:

| Year | Assets | End of year loan balance | End of year accrued interest |
|------|--------|--------------------------|------------------------------|
| 1987 | $65,156,718 | $77,978,575 | $11,276,795 |
| 1988 | 1,474 | 27,742,833 | 2,523,458 |
| 1989 | 1 | 27,742,833 | 5,297,741 |
| 1990 | 1 | 27,742,833 | 8,072,024 |
| 1991 | 1 | 27,742,833 | 9,531,373 |

GSD accrued interest expense on the Sunbelt note of $1,459,349 for 1991 from January 1 to July 11, 1991.

On July 15, 1992, GSD filed a Form 1065 for the period from January 1 to July 11, 1991, which it designated as its final return. Petitioner signed GSD's return for 1991 in his capacity as general partner. GSD deducted interest expense of $1,459,349 on its 1991 return (GSD's 1991 accrued interest deduction). The interest deduction created a $1,459,349 loss (the 1991 loss) because GSD reported no income. The Schedules K-1, Partner's

---

[1](...continued)
bankruptcy * * * a successor General Partner is elected by a majority in interest, and not in numbers of the remaining Partners;.

Share of Income, Credits, Deductions, etc., attached to the Form 1065 allocated 66.67 percent of the loss to petitioner ($972,899) and 33.33 percent to Schlesinger and his bankruptcy estate.

7.  Settlement of the Federal Suit

The counterclaim, the Federal court suit, and notices of lis pendens initiated by GSD, petitioner, and Schlesinger were settled with Sunbelt and the bankruptcy trustee for petitioner's chapter 7 bankruptcy estate in September 1992.  GSD and the bankruptcy trustee for petitioner's bankruptcy estate agreed to: (1) Release all claims against Sunbelt with prejudice, (2) release all claims to Encino Park, (3) not disturb Sunbelt's title to Encino Park, and (4) release all claims to certain condemnation proceeds.  Sunbelt agreed to:  (1) Pay $20,000 to the bankruptcy trustee for petitioner, and (2) release all claims against GSD and petitioner.

8.  Petitioner's Tax Returns for 1991, 1992, 1993, and 1994

Petitioner's filing status for the years 1991 to 1994 was as follows:  Joint with Martha Johnston for 1991; single for 1992; married filing separately for 1993; and joint with Paula Gulley for 1994.  Paula Gulley filed as married filing separately for 1993.

Petitioner's GSD partnership interest was a community asset of petitioner and Johnston.  Thus, one-half of the 1991 partnership loss was allocable to each of them.  Petitioner and

Johnston reported a net operating loss of $972,899, based on his share of GSD's accrued interest deduction for 1991.

On his 1992 return, petitioner reported a net operating loss of $44,896 from his Schedule C, Profit or Loss From Business, real estate consulting business (the 1992 NOL). As a result, he could not make use of an NOL in 1992.

Petitioner carried forward half of the 1991 NOL to his 1993 return. On their 1994 return, petitioners carried forward the portion of the 1991 NOL that petitioner did not use in 1993. Petitioner (and petitioners) reported adjusted gross income/(loss), net operating losses, and tax liability for 1991 to 1994 as follows:

| Year | AGI reported on return | NOL reported on return | Tax liability |
|------|------------------------|------------------------|---------------|
| 1991 | ($1,012,064) | ($1,017,764) | -0- |
| 1992 | (552,706) | (504,854) | -0- |
| 1993 | (443,041) | (549,750) | $1,408 |
| 1994 | (205,631) | (444,641) | 1,630 |

Paula Gulley did not claim any of the net operating loss carryover for 1993.

OPINION

Petitioner owned a 66.67-percent general partnership interest in the GSD limited partnership (GSD) on July 11, 1991. On that date, petitioner filed a petition in bankruptcy, which petitioners contend caused GSD's tax year to end. GSD filed a return it designated as its final tax return on July 15, 1992, for the period January 1 to July 11, 1991. GSD had a loss of

$1,459,349 for that period and allocated $972,899 of that loss to petitioner.

Petitioners contend that they may carry half of the 1991 NOL forward to 1993 and 1994 under any of several theories:  (1) The 1991 NOL passed through GSD to its general partner (petitioner) on July 11, 1991, when (according to petitioners) GSD terminated; (2) GSD's tax year closed as to petitioner under section 706(c)(2) on July 11, 1991, causing the partnership's tax items, such as the accrued interest on the Sunbelt note, to pass through to petitioner on that date; (3) GSD's 1991 partnership loss for the period January 1 to July 11, 1991, should be prorated to petitioner under section 706(d); and (4) petitioner's interest in GSD reverts to him because the bankruptcy trustee abandoned the partnership interest under 11 U.S.C. section 554.  Petitioners also contend that petitioner's share of the 1991 NOL was not extinguished by the amount of cancellation of indebtedness income excluded from gross income under section 108.

A.   Whether the GSD Partnership Terminated on July 11, 1991

   1.   Whether GSD Terminated on July 11, 1991, Under Section 708(b)(1)(A)

Petitioners contend that GSD terminated on July 11, 1991, when petitioner filed his petition in bankruptcy.  Petitioners also argue that GSD terminated because it carried on no business

and had no assets after the Encino Park foreclosure,[2] and had no partners after Schlesinger and petitioner filed their petitions in bankruptcy. We disagree.

A partnership terminates for tax purposes when no part of any business, financial operation, or venture of the partnership is carried on by any of its partners in a partnership. See sec. 708(b)(1)(A).[3] For purposes of section 708(b)(1)(A), the date of termination is the date on which the winding up of a partnership's affairs is completed. See sec. 1.708-1(b)(1)(iii)(a), Income Tax Regs. Winding up is not defined in the Code or regulations.

Petitioners point out that the GSD partnership agreement states that GSD terminates upon the bankruptcy of the general partner. See supra note 1. Petitioners also point out that, under Texas law, a person ceases to be a general partner in a

---

[2] GSD's partnership returns showed assets of $1,474 for 1988, and $1 for 1989, 1990, and 1991.

[3] Sec. 708(b) provides:

SEC. 708(b). Termination.--(1) General rule. For purposes of subsection (a), a partnership shall be considered as terminated only if--

    (A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or

    (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

limited partnership when he or she files a voluntary petition in bankruptcy. See Tex. Rev. Civ. Stat. Ann. art. 6132a-1, sec. 4.02(a)(4)(B) (West 1999). Thus, petitioners contend that petitioner ceased being the general partner of GSD, and GSD dissolved, when petitioner filed the petition in bankruptcy on July 11, 1991. We disagree. The GSD provision which states that GSD terminated upon the bankruptcy of its general partner did not cause GSD to terminate on July 11, 1991, because Federal law, not State law, controls when a partnership terminates for Federal tax purposes. See Fuchs v. Commissioner, 80 T.C. 506, 510 (1983) (State law dissolution does not cause a partnership to terminate for Federal tax purposes); Estate of Skaggs v. Commissioner, 75 T.C. 191, 198 (1980), affd. 672 F.2d 756 (9th Cir. 1982).

Petitioners would not prevail even if State law controlled when a partnership terminated for tax purposes. Under Texas law, a partnership is not terminated on dissolution but continues until the winding up of partnership affairs is completed. See Tex. Rev. Civ. Stat. Ann. art. 6132b, sec. 30 (West 1999); Kelly Associates v. Aetna Casualty and Sur Co., 681 S.W.2d 593, 596-597 (Tex. 1984). Petitioners contend that the winding up of GSD's affairs was complete on July 11, 1991. Under Texas law, litigation of claims by and against partners is part of the winding up of a partnership. See United States v. Saks, 964 F.2d 1514, 1524-1525 (5th Cir. 1992). See generally Crane & Bromberg,

Partnerships 460 (1968). GSD, petitioner, Schlesinger, and Sunbelt litigated the Federal suit until September 1992. Thus, GSD was winding up when petitioner filed his petition in bankruptcy on July 11, 1991. We conclude that GSD continued to exist for tax purposes until it settled the pending Sunbelt litigation in September 1992.

2.  Whether GSD Terminated on July 11, 1991, Under Section 708(b)(1)(B)

A partnership terminates for tax purposes if there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits. See sec. 708(b)(1)(B).

Petitioner owned 66.67 percent of the interests in capital and profits of GSD. When petitioner filed the petition in bankruptcy, the bankruptcy estate succeeded to the tax attributes of petitioner's interest in GSD. See sec. 1398(b)(2), (g). Petitioners contend that petitioner should be treated as having sold or exchanged 50 percent or more of his interest in GSD when the bankruptcy estate succeeded to his interest in GSD.

We disagree that petitioner sold or exchanged his partnership interest when he filed his petition in bankruptcy. A transfer of a partnership interest from a debtor to the debtor's bankruptcy estate is not a sale, exchange, or liquidation of the partner's interest under section 706(c). See sec. 1398(f); Smith v. Commissioner, T.C. Memo. 1995-406. Petitioners contend that Smith supports petitioners' arguments, and that Smith did

not involve a partnership interest or an interpretation of section 1398(f).  We disagree.  See Smith v. Commissioner, supra.  Thus, the transfer of petitioner's interest in GSD to the bankruptcy estate was not a sale or exchange, and did not cause GSD to terminate.  See sec. 1398(f).

B.    Whether Petitioner Sold or Exchanged His Interest in GSD on July 11, 1991, Under Section 706(c)(2)

A partnership's tax year closes with respect to a partner who sells or exchanges his interest in a partnership, and with respect to a partner whose interest is liquidated.  See sec. 706(c)(2)(A).  Petitioners contend that petitioner's bankruptcy caused him to cease being a general partner in GSD under Texas law, and that his withdrawal from GSD triggered a distribution to him of the fair value of his interest.  See Tex. Rev. Civ. Stat. Ann. art. 6132a-1, secs. 6.02, 6.04 (West 1999).  Thus, petitioners contend that GSD's tax year closed as to petitioner under section 706(c)(2) on July 11, 1991.  We disagree.  We conclude for the reasons stated at paragraph A-2, above, that petitioner did not sell, exchange, or liquidate his interest in the partnership for purposes of section 706(c)(2)(A) when he filed the bankruptcy petition.

C.    Whether Interest Expense Is Allocated Pro Rata Between Petitioner and the Bankruptcy Estate Under Section 706(d)

Petitioners contend that, under section 706(d), GSD's losses for the period from January 1 to July 11, 1991, are allocated to

petitioner, and its losses after July 11, 1991, are allocated to the bankruptcy estate because petitioner's filing of the petition in bankruptcy (and the bankruptcy estate's succession to ownership of his interest in GSD) caused a change in ownership of that interest. We disagree.

Petitioners point out that in Smith v. Commissioner, supra, the Commissioner disallowed a pro rata portion of losses from real estate rentals; i.e., allowed the losses to the taxpayer for the part of the year before he filed in bankruptcy. Petitioners apparently contend that the Commissioner followed the same procedure for the taxpayers' partnership losses; however, the opinion in Smith makes clear that the taxpayers failed to prove the amount of partnership losses or that they were incurred before the taxpayers filed in bankruptcy. Thus, Smith is silent on the point for which petitioners cite it here.

Income, gain, loss, deduction, and credit of a partnership are treated as if received by the partner on the last day of the partnership's tax year. See sec. 706(a). Thus, if a partner commences a bankruptcy case before the last day of the partner's tax year and the bankruptcy estate holds the partnership interest on the last day of that year, then that partner's share of any income, gain, loss, deduction, or credit of the partnership is treated as earned by the bankruptcy estate.

The bankruptcy estate succeeded to petitioner's interest in

GSD under section 1398(b)(2) and (g) when petitioner filed his petition in bankruptcy on July 11, 1991, and it held petitioner's interest in GSD at the end of GSD's 1991 taxable year, December 31, 1991. Thus, the bankruptcy estate succeeded to petitioner's share of the 1991 NOL. See sec. 1398(f). Petitioner's transfer of his interest in GSD to the bankruptcy estate was not a change in interest requiring an allocation of his distributive share of GSD's partnership items between himself and the bankruptcy estate for purposes of section 706(d)(1).

D.   Whether the GSD Partnership Interest Was Abandoned by the Bankruptcy Trustee and Reverts to Petitioner

Petitioners contend that petitioner's interest in GSD was not administered by the bankruptcy trustee, and thus it reverts to the debtor as though he had not filed a bankruptcy petition. See 11 U.S.C. sec. 554 (West 1988). Petitioners suggest that 11 U.S.C. section 363 (West 1988) lists use, sale, or lease of property as examples of what is contemplated by a bankruptcy trustee's administration of an asset. Petitioners argue that the bankruptcy trustee did not administer the GSD partnership interest because he filed no motion to sell, exchange, distribute, lease, use, or hypothecate the GSD partnership interest or to otherwise dissolve the partnership. Petitioners cite In re Dewsnup, 908 F.2d 588 (10th Cir. 1990), for the proposition that a partnership asset abandoned by a bankruptcy trustee returns to the debtor (petitioner) as if the partnership

interest had never entered the bankruptcy.

We disagree that the bankruptcy trustee abandoned the GSD interest. The trustee settled the Sunbelt litigation for $20,000, which was paid to the bankruptcy estate. Thus, he acted to preserve the value of petitioner's partnership interest.

Respondent stated on brief that the bankruptcy trustee abandoned the GSD interest when the bankruptcy estate closed. Petitioners misconstrue this as respondent's concession that the trustee abandoned petitioner's GSD interest. On the contrary, respondent was merely pointing out that the GSD interest was deemed to have been abandoned to petitioner under 11 U.S.C. section 554(c) (West 1988) when the bankruptcy case was closed in August 1993. Respondent does not concede that the bankruptcy trustee abandoned the GSD interest during the pendency of petitioner's bankruptcy; rather, respondent contends the opposite, that is, that the bankruptcy trustee acted to preserve the value of petitioner's interest in GSD.

E.   Whether Section 108 Eliminates the 1991 NOL

Respondent argues that no part of the 1991 NOL remained after applying section 108. Petitioners contend that, because petitioner did not elect to terminate his 1991 tax year under section 1398(d)(2), the 1991 NOL was a tax attribute of petitioner's, rather than of his bankruptcy estate. Thus, petitioners contend the 1991 NOL was not extinguished by section

108 because the reduction of tax attributes under section 108(b)(1) is determined by the bankruptcy estate, not the individual debtor. See sec. 108(d)(8). We disagree that the 1991 NOL was a tax attribute of petitioner.

Petitioner's interest in GSD passed to the bankruptcy estate of petitioner on July 11, 1991, when he filed the bankruptcy petition. The 1991 NOL was thus a tax attribute belonging to, and usable by, the bankruptcy estate, and it remained in the estate until petitioner was discharged from bankruptcy and the estate was terminated. See sec. 1398(i). The fact that petitioner did not elect a short taxable year under section 1398(d)(2) does not entitle him to the NOL as his tax attribute. See Kahle v. Commissioner, T.C. Memo. 1997-91 (taxpayer could not use NOL carryforward in the taxable year in which he filed a petition in bankruptcy because he did not elect a short taxable year under section 1398(d)(2); NOL carryforward from prior year passed to bankruptcy estate upon the filing of the petition). Petitioner succeeded only to the unused portion, if any, of the 1991 NOL when his bankruptcy case closed in August 1993. See sec. 1398(i). Any amount excluded from gross income under section 108(a) is applied to reduce the tax attributes, such as NOL's, of the taxpayer. See sec. 108(b)(1). Thus, section 108(b) requires that the 1991 NOL be reduced by the amount of discharge of indebtedness income excluded from income under

section 108(a).  See also <u>Firsdon v. United States</u>, 95 F.3d 444 (6th Cir. 1996).  Petitioners' claim that <u>Firsdon</u> does not apply in the instant case because it did not address the election under section 1398(d)(2) is without merit for the reasons stated above.

Respondent's determinations in the notices of deficiency are presumed to be correct, and petitioners bear the burden of proving otherwise.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Petitioner listed on his bankruptcy schedules liabilities totaling $60.5 million, which greatly exceeds half of the 1991 NOL.  Petitioners have not shown that any part of the 1991 NOL remained after the section 108 reduction.

Accordingly,

<u>Decision will be entered</u>

<u>for respondent</u>.