122 T.C. No. 20


UNITED STATES TAX COURT


OREN L. BENTON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7602-02.                    Filed May 12, 2004.


        P's ch. 11 bankruptcy commenced in 1995, and he
was discharged upon the confirmation of his plan of
reorganization during 1997.  Effectively, at the time
of confirmation, all of the estate's assets were
transferred to a liquidating trust for the benefit of
creditors.  P had net operating losses (NOLs) that
arose in years prior to the bankruptcy commencement.
P's bankruptcy estate also incurred tax losses.  The
bankruptcy estate succeeded to P's precommencement
NOLs.  Under sec. 1398(i), I.R.C., P would succeed to
the tax attributes (NOLs) of the bankruptcy estate,
upon its termination.  P contends that his ch. 11
bankruptcy terminated upon the confirmation of the plan
and the discharge of the debtor.  R contends that a ch.
11 bankruptcy does not terminate until closed by a
final order of a bankruptcy court.

P seeks to apply NOLs to his 1995, 1996, and 1997 income which was not includable in the bankruptcy estate. R contends that P may not carry NOLs to any years prior to the termination of P's bankruptcy estate; i.e., 1996 or 1995.

1. Held: The "termination" of P's ch. 11 bankruptcy, for purposes of sec. 1398, I.R.C., occurred upon the confirmation of the plan and discharge of the debtor.

2. Held, further, P may use NOLs with respect to his separate tax reporting in the year of the commencement of his bankruptcy and later years, to the extent allowed under sec. 172, I.R.C., and the regulations thereunder.

Oren L. Benton, pro se.

Frederick J. Lockhart, Jr., and John A. Weeda, for respondent.

OPINION

GERBER, Judge: Respondent determined deficiencies in petitioner's Federal income taxes, an addition to tax, and penalties for the short taxable year of February 23 through December 31, 1995, and the taxable years 1996 and 1997, as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662 |
|------|-----------|------------------------|------------------------|
| 1995[1] | $75,771 | -- | $15,154 |
| 1996 | 240,565 | -- | 48,113 |
| 1997 | 249,337 | $57,967 | 46,374 |

[1] Pursuant to sec. 1398(d)(2)(D), petitioner elected to terminate his taxable year as of the bankruptcy commencement date, Feb. 23, 1995. The deficiency is with respect to the short tax year of Feb. 23 through Dec. 31, 1995.

This matter is before the Court on respondent's motion for partial summary judgment. See Rule 121.[1] The issues presented for our consideration are: (1) Whether petitioner succeeded to the tax attributes of his chapter 11 bankruptcy estate at the time of confirmation of the plan of reorganization or, alternatively, upon entry of a final order closing the bankruptcy proceeding, see sec. 1398(i); (2) whether petitioner may carry net operating losses (NOLs) to his 1995, 1996, and 1997 tax years; and (3) whether certain payments petitioner received were compensation for his services.

## Background

Petitioner resided in Oto, Iowa, at the time his petition was filed in this proceeding. On February 23, 1995, petitioner filed a voluntary petition with the U.S. Bankruptcy Court for the District of Colorado under chapter 11 of the Bankruptcy Code. Concurrently, four related petitions were filed for business entities controlled by petitioner. An additional entity controlled by petitioner filed a petition under chapter 11 during 1996. All six bankruptcy cases were administered as a related group. A separate bankruptcy estate was established for each entity, including the Oren L. Benton Bankruptcy Estate (Benton

_____

[1] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the taxable years at issue.

estate) and the Nuexco Trading Corp. Bankruptcy Estate (NTC bankruptcy estate). As of the date of each petition, the entity's assets became assets of its bankruptcy estate. Pursuant to section 1398(d)(2)(D), petitioner elected to terminate his taxable year as of February 23, 1995. A separate Federal income tax return was filed for petitioner's short taxable year February 23 through December 31, 1995.

Among the assets that made up the Benton estate were petitioner's interests in three entities that were involved in the operation and ownership of the Colorado Rockies National League Baseball Franchise. The three interests included a limited partnership interest in the Colorado Baseball Club Limited Partnership (CBCLP), which was the owner of the National League franchise. In addition, Colorado Baseball Management, Inc. (CBM), was a corporation entitled to a percentage of the gross revenues of CBCLP. Lastly, Colorado Baseball, Inc. (CBI), was the managing general partner in CBCLP.

A second amended plan of reorganization (the plan), dated August 18, 1997, for petitioner and his related bankruptcy estates was to be effective on August 31, 1997. Until the August 18, 1997, confirmation of the plan, petitioner served as the debtor in possession. Among other things, the plan provided that on August 31, 1997, most of the various bankruptcy estates' assets would be transferred into a liquidating trust to be

administered for the benefit of creditors by a trustee.  The
trustee was responsible for all tax matters relating to the
estates subject to the supervision of an oversight committee.
The creditors agreed in the plan that the tax attributes would go
to the debtor (petitioner) upon confirmation of the plan.

The plan also provided that the interest in CBCLP was to be
placed in the NTC bankruptcy estate, and the CBM and CBI
interests were to remain in the Benton estate.  The motivation
for not transferring these assets to the liquidating trust was to
maintain the S corporation status of CBM and CBI.  This limited
exception to the general transfer of assets to the liquidating
trust was approved by the Benton estate's creditors and promoted
by Benton's fellow S corporation shareholders.  Those
shareholders were concerned about whether the placement of an
interest in an S corporation into a bankruptcy liquidating trust
would result in the termination of S corporation status.  Their
concern was focused upon whether a liquidating trust and/or
liquidating trustee would be a qualified shareholder of an S
corporation.[2]

---

[2] We note that sec. 1361(b)(1)(B) and (c)(3) permits the
estate of an individual in bankruptcy to become a shareholder of
an S corporation without triggering termination of S corporation
status.  Cf. Mourad v. Commissioner, 121 T.C. 1 (2003).  We
surmise that the shareholders were concerned about S corporation
status in the event that the stock were transferred from the
bankruptcy estate to the liquidating trust.

The Benton estate retained bare legal title to the interests in CBI and CBM with no rights of ownership. The plan included the following terms, which in effect made the Benton estate a mere nominee:

    i) the Liquidating Trustee shall be deemed to hold an irrevocable proxy and power of attorney to act on the Benton Estate's behalf with respect to the Baseball Interests or any of them;

    ii) * * * [the Baseball Interests] shall be deemed ordered * * * to pay over all payments on account of the Baseball Interests as the Liquidating Trustee shall direct;

    iii) the Benton Estate shall not sell, encumber, or otherwise dispose of any interest in the Baseball Interests without the express prior written consent of the Liquidating Trustee. To the extent required to effectuate the purposes of this section, the Liquidating Trustee shall be deemed the representative of the Estates in regard to the administration of the Baseball Interests.

On September 1, 1997, the first day following the effective date of the plan, petitioner was discharged under the provisions of Bankruptcy Code section 1141(d) from any debt that arose before confirmation, and he was relieved of his status as "debtor-in-possession".

On his 1997 Federal income tax return, petitioner claimed approximately $84 million in NOLs that had arisen before the commencement of the bankruptcy and had not been used by his bankruptcy estate. Petitioner contended that he received the NOLs from his bankruptcy estate as of August 31, 1997, the effective date of the confirmed plan. During April 1999

petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return, for the short taxable year 1995 and the calendar year 1996, attempting to use NOLs initially reported on his 1997 return. During October 2001, petitioner filed amended returns containing $59 million in increased claims for NOLs.

Petitioner received the following amounts from CBM during his taxable years ended December 31, 1995, 1996, and 1997:

| Taxable Year | Amount |
|---|---|
| 1995 | $200,000 |
| 1996 | 1,000,000 |
| 1997 | 925,000 |
| 1997 | 60,000 |

Petitioner reported the amounts received in 1995 and 1996 as wages on his Forms 1040, U.S. Individual Income Tax Return. He did not, however, report as income the amounts he received during 1997 on his original 1997 return. Instead, petitioner attached a statement to his 1997 return asserting that the amounts he received from CBM in 1997 belonged to the Benton estate and were loans from the estate to him. On the statement, he also maintained that the Benton estate was challenging the characterization of the payments as compensation, asserting that they were payments with respect to the stock. Petitioner, in amended returns for 1995 and 1996, included statements similar to those included on his 1997 return, asserting that the payments were erroneously included as compensation and should be properly characterized as loans from the Benton estate.

## Discussion

I. <u>Summary Judgment</u>

Respondent moved for partial summary judgment with respect to three issues in this case. Summary judgment is intended to expedite litigation and avoid unnecessary trials. <u>Fla. Peach Corp. v. Commissioner</u>, 90 T.C. 678, 681 (1988). A motion for partial summary judgment may be granted if there is no genuine issue as to any material fact. See Rule 121(b); <u>Elec. Arts, Inc. v. Commissioner</u>, 118 T.C. 226, 238 (2002). The moving party bears the burden of showing that there is no genuine issue of material fact, and factual inferences will be read in a manner most favorable to the party opposing summary judgment. <u>Bond v. Commissioner</u>, 100 T.C. 32, 36 (1993); <u>Dahlstrom v. Commissioner</u>, 85 T.C. 812, 821 (1985). A partial summary adjudication is appropriate if all issues in the case are not disposed of. See Rule 121(b); <u>Turner Broad. Sys., Inc. & Subs. v. Commissioner</u>, 111 T.C. 315, 323-324 (1998). This case is ripe for partial summary judgment with respect to the termination and net operating loss issues. Genuine issues of material fact exist however, with respect to the compensation issue.

II. <u>The Controversy--Generally</u>

Petitioner seeks to use NOLs that arose before and during his bankruptcy proceeding. Under section 1398(i), petitioner would succeed to such tax attributes upon the "termination of an

estate". Petitioner contends that, in the context of his chapter 11 bankruptcy reorganization, the estate terminated at the time of the confirmation of the plan of reorganization and discharge of the debtor.[3] Respondent contends that the bankruptcy estate does not terminate until the bankruptcy proceeding is formally closed.[4] We must resolve this threshold question before considering whether petitioner is entitled to use certain net operating loss deductions from the bankruptcy estate.

The relationship, for Federal tax purposes, between a bankrupt and a chapter 11 bankruptcy estate has been described as follows:

> The filing of a bankruptcy petition under Chapter 11 creates a new taxable entity, the bankruptcy estate, that is separate from the debtor. Sec. 1398. The bankruptcy estate computes its taxable income in the same manner as an individual does, except that the entity must use the tax rates applicable to a married individual filing a separate return. Sec. 1398(c).
>
> Further, the bankruptcy estate succeeds to and takes into account the individual debtor's tax attributes (e.g., any NOL [net operating loss]

---

[3] Our consideration of the issues in this case is limited to the effect of sec. 1398 in the context of an individual ch. 11 bankruptcy reorganization.

[4] We note that at the time of the filing of the motion for summary judgment, the bankruptcy court had not entered a final order closing petitioner's ch. 11 proceeding. If we were to hold that the closing of the bankruptcy proceeding was the time of "termination", the bankruptcy estate's tax attributes would not transfer to petitioner until the closing of the estate. That could create a situation where petitioner would not be able to use the tax attributes even though the bankruptcy estate no longer controlled the assets or needed the tax attributes.

carryforward). Sec. 1398(g). In the case of NOLs, the bankruptcy estate succeeds to the NOLs as determined under section 172, as of the first day of the individual debtor's taxable year in which the case commences. Sec. 1398(g)(1). The NOLs as determined by a calendar year individual debtor, as of January 1 of the year the debtor files a bankruptcy petition, go to the bankruptcy estate for its exclusive use for the benefit of the creditors on the commencement date. Id. The individual debtor then succeeds to and takes into account the NOLs of the bankruptcy estate at the termination of the bankruptcy case. Sec. 1398(i). * * * [Lassiter v. Commissioner, T.C. Memo. 2002-25.]

III. Termination for Purposes of Section 1398(i)

Petitioner seeks to use tax losses from his bankruptcy estate. Section 1398(i) provides for the circumstances under which such tax attributes become available to the debtor/taxpayer. Section 1398(i) provides:

> SEC. 1398(i). Debtor Succeeds to Tax Attributes of Estate.--In the case of a termination of an estate, the debtor shall succeed to and take into account the items referred to in paragraphs (1), (2), (3), (4), (5), and (6) of subsection (g) in a manner similar to that provided in such paragraphs (but taking into account that the transfer is from the estate to the debtor instead of from the debtor to the estate). In addition, the debtor shall succeed to and take into account the other tax attributes of the estate, to the extent provided in regulations prescribed by the Secretary as necessary or appropriate to carry out the purposes of this section. [Emphasis added.]

The parties disagree about the meaning of the phrase "termination of an estate". Petitioner argues that the termination of his estate occurred when his plan of reorganization was confirmed. Respondent, however, argues that termination occurs only at the time when a bankruptcy court

enters an order formally closing the proceeding and releasing its jurisdiction over a bankruptcy estate.

The phrase "termination of an estate" could have differing meanings in the context of a bankruptcy proceeding. If Congress had used the phrase "closing of the bankruptcy proceeding", there would have been less ambiguity or room for interpretation. However, either respondent's or petitioner's interpretation could fit within the meaning of the phrase "termination of an estate". For example, a bankruptcy estate could be considered to be terminated when a bankruptcy court enters an order closing the estate. Likewise, in the context of a plan of reorganization, when a bankruptcy court confirms a plan and discharges the debtor, the estate, in substance and effect, may be considered to be terminated. At that point in the proceeding, the bankruptcy court's role is to monitor the plan of reorganization. The disputed phrase is not defined in the Internal Revenue Code or the underlying regulations.

Section 350(a) of the Bankruptcy Code specifically provides for the closing of a bankruptcy proceeding "After an estate is fully administered and the court has discharged the trustee". 11 U.S.C. sec. 350(a) (2000). Bankruptcy courts have regularly defined closing of an estate as the time a final decree is entered closing the case. See S.S. Retail Stores v. Ekstrom, 216 F.3d 882, 884 (9th Cir. 2000); In re Duplan Corp., 212 F.3d 144,

148 (2d Cir. 2000); Duebler v. Sherneth Corp., 160 F.2d 472, 474 (2d Cir. 1947).

Similarly, the phrase "termination of an estate" has, by necessity, been interpreted and defined by numerous bankruptcy courts. For example, one bankruptcy court, in deciding whether the bankruptcy estate had incurred certain administrative expenses in a chapter 11 bankruptcy proceeding, held that the estate had terminated upon the confirmation of the plan of reorganization. See In re Westholt Manufacturing, Inc., 20 Bankr. 368 (1982), affd. sub nom. United States v. Redmond, 36 Bankr. 932 (D. Kan. 1984). In the In re Westholt case, the Government argued that the debtor's unpaid employment taxes were incurred while the debtor was under chapter 11 bankruptcy protection and therefore the taxes were administrative expenses of the estate. In In re Westholt the Government argued, as it has in the case before us:

> until a case is closed pursuant to a final decree at the consummation of the Chapter 11 plan, the bankruptcy estate remains in existence and the court retains jurisdiction over the reorganization plan so that employment and unemployment taxes incurred by the debtor in possession following confirmation of the plan are taxes incurred by the estate and, thus, properly characterized as administrative expenses. * * * [Id. at 371.]

The court in In re Westholt, however, held that the estate was not obligated for the employment tax because the estate terminated upon the confirmation of the plan. The court

explained that "At confirmation, all the property of the estate is vested in the debtor, thereby terminating the estate's existence, although the court has continued jurisdiction under section 1142 to oversee the plan's execution."  Id. at 372 (fn. ref. omitted).  The principle that an estate terminates upon confirmation of the plan of reorganization is one that is widely held amongst the bankruptcy courts.  See, e.g., In re Walker, 198 Bankr. 476 (Bankr. E.D. Va. 1996); Cook v. Chrysler Credit Corp., 174 Bankr. 321 (M.D. Ala. 1994); In re Mold Makers, Inc., 124 Bankr. 766 (Bankr. W.D. Ill. 1990); Marine Iron & Shipbuilding Co. v. City of Duluth, 104 Bankr. 976 (D. Minn. 1989); In re Tri-L Corp., 65 Bankr. 774 (Bankr. D. Utah 1986).

In a similar vein, it was held in Gen. Elec. Credit Corp. v. Nardulli & Sons, Inc., 836 F.2d 184, 190 (3d Cir. 1988), that "Insolvency proceedings terminate upon confirmation of a plan of reorganization, or on the effective date or consummation date of the plan, if provided for in the plan."  The specific issue considered in that chapter 11 bankruptcy proceeding was whether a creditor's perfected security interest had expired.  As a threshold to the primary issue, the court had to decide when the insolvency proceeding terminated.

Likewise, it was held that a bankruptcy court's postconfirmation jurisdiction was limited to matters concerning the operation of the confirmed plan and did not extend to

questions interpreting substantive aspects underlying the plan. In re Greenly Energy Holdings, Inc., 110 Bankr. 173 (Bankr. E.D. Pa. 1990). In that case, the bankruptcy court was considering whether it retained postconfirmation jurisdiction to decide corporate matters, such as who owned stock, entitlement to distributions, shareholder representation on a board of directors, and voting rights under the confirmed plan of reorganization. The court "[balanced] the need to retain jurisdiction [of] post-confirmation [matters] with the need to end the reorganization process at some point." Id. at 180. The court did not decide the corporate matters and relied on the holding in In re Westholt Manufacturing, Inc., supra, and other cases that "'At confirmation, all the property of the estate is vested in the debtor, thereby terminating the estate's existence, although the court has continued jurisdiction under section 1142 * * * to oversee the plan's execution.'" In re Greenly Energy Holdings, Inc., supra at 180 (quoting In re Westholt Manufacturing, Inc., supra at 372).

The above-referenced line of chapter 11 bankruptcy cases uniformly holds that, for purposes of determining substantive questions regarding the estate, a "termination" occurs at the time the debtor's plan of reorganization is confirmed. In a chapter 11 proceeding involving a venue question, however, the holding of the Court of Appeals for the Third Circuit varied from

the above holdings.  The Court of Appeals held that for the procedural purpose of venue, the bankruptcy estate did not terminate at the time of confirmation.  <u>In re Emerson Radio Corp.</u>, 52 F.3d 50, 54 (3d Cir. 1995).  In <u>In re Emerson</u>, the court considered whether to transfer venue in a chapter 11 bankruptcy proceeding under bankruptcy rule 1014(b).  That rule provides procedures for when petitions of related debtors are filed in different bankruptcy courts.  Bankruptcy rule 1014(b), in pertinent part, provides:

> "If petitions commencing cases under the Code are filed
> in different districts * * * the court may determine,
> in the interest of justice or for the convenience of
> the parties, the district or districts in which the
> case or cases should proceed.  * * * "  [<u>In re Emerson
> Radio Corp.</u>, <u>supra</u> at 53.]

In <u>In re Emerson</u>, one party argued that the bankrupt was no longer a "debtor" for purposes of bankruptcy rule 1014(b) because its bankruptcy estate terminated upon confirmation of the reorganization plan.  The Court of Appeals for the Third Circuit rejected that argument and held that for purposes of bankruptcy rule 1014(b), the debtor's status was not ended at the time of confirmation of its plan of reorganization.

In holding that the venue rules apply until such time as the bankruptcy proceeding is closed, the court in <u>In re Emerson</u> focused on the need of the bankruptcy parties to "know with a fair degree of certainty the court which can entertain an application", and that "Applying Rule 1014(b) and section 350 [of

the Bankruptcy Code] as written supplies that certainty." Id. at 55. We note that the court in In re Emerson did not attempt to define "terminate" in the context of section 1398, but held that it retained jurisdiction over the debtor until the bankruptcy proceeding finally closed.

The holding in In re Emerson is readily distinguishable from the holdings in numerous cases that have held that a "termination" occurs at the point of confirmation. The holding in In re Emerson was applied in a procedural context to generally determine the proper venue for a chapter 11 proceeding. The focus of that inquiry must necessarily be the entire chapter 11 proceeding from the time of petition to the closing.

In the setting of a bankruptcy reorganization, it would be more appropriate to transfer the tax attributes of the bankruptcy estate to the discharged debtor when the plan of reorganization is confirmed. The underlying purpose of a bankruptcy reorganization is "rehabilitating the debtor and avoiding forfeitures by creditors." Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 389 (1993). "[T]o achieve that purpose, the debtor has to continue to operate between the filing of the petition and the adjudication of bankruptcy." Pa. Dept. of Envtl. Res. v. Tri-State Clinical Labs., Inc., 178 F.3d 685, 690 (3d Cir. 1999).

The approval of the plan and the concurrent discharge facilitates the debtor's continuing his prebankruptcy activity. At that juncture, the estate is generally relieved of the administration of the debtor's property. Logically, the debtor should be able to go forward with prebankruptcy activity, including any assumption of tax attributes of the bankruptcy estate. It would be illogical to keep a debtor from a tax loss that might assist in the rehabilitation process during a period when the estate was, for all effects and purposes, dormant.

In the case we consider, petitioner was the debtor in his chapter 11 reorganization.[5] Recognizing that chapter 11 bankruptcy reorganizations are intended to rehabilitate the debtor, we note that section 1141 of the Bankruptcy Code provides "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. sec. 1141(b) (2000). Those bankruptcy cases which have held that termination occurs upon confirmation were chapter 11 bankruptcy reorganizations, and the deciding courts placed reliance on section 1141 of the Bankruptcy Code. We must note that section 1141 of the Bankruptcy Code applies only to chapter 11 bankruptcies. See Cusano v. Klein, 264 F.3d 936 (9th Cir. 2001). We also recognize that the phrase

---

[5] We do not consider here whether the phrase "termination of an estate" should be universally understood in the context of all types of bankruptcy proceedings.

"termination of an estate" as used in section 1398(i) could have a different meaning in the context of other types of bankruptcy proceedings, e.g., chapter 7 liquidating proceedings. The possibility of differing treatment, however, may be appropriate and may account for the use of "terminate" in section 1398(i), instead of the term "closed".

An important difference between chapter 11 and other bankruptcy proceedings is that the chapter 11 debtor is generally discharged at the time of confirmation of the plan. In addition, at or about the time of confirmation the estate's assets are either returned to the debtor and/or (as in this case) transferred to a liquidating trust for the benefit of creditors. A liquidating trust for the benefit of the estate's creditors has been treated as a taxable entity separate from and not a continuation or arm of the estate and/or the debtor. Holywell Corp. v. Smith, 503 U.S. 47 (1992); see also In re Shank, 240 Bankr. 216 (Bankr. D. Md. 1999). In Holywell, the Supreme Court, in overruling the lower courts, held that when a plan of reorganization caused the transfer of the bankruptcy estate's assets to a liquidating trust for the benefit of creditors, the plan did not merely substitute the trustee for the debtor as the fiduciary of the bankruptcy estate, but created the trust as a separate entity and taxpayer.

Accordingly, once a plan vesting an estate's assets in a liquidating trust is confirmed, the estate is generally not required to report or pay tax on gains derived by the trust from disposition of those assets. In that respect, the estate lacks the potential for the incidence of tax or use of tax losses. Conversely, at that time the debtor is being released for the purpose of rehabilitation. Those factors are most conducive to and support an approach where the estate's tax attributes be returned to the debtor.[6]

In the case before us, all but two of the estate's assets were transferred to the liquidating trust. The two assets were the stock of S corporations, which the estate was permitted to hold as a mere nominee in order to maintain S corporation status. Under the terms of the plan, the estate did not maintain control or, in effect, ownership of the stock. Accordingly, there is no reason to delay the transfer of the estate's tax attributes to the debtor/petitioner in this case. We hasten to note that as of the time of the summary judgment motion in 2003, petitioner's chapter 11 bankruptcy proceeding had not been formally closed. Under those circumstances, waiting until the closing of the chapter 11 proceeding would be unjust and a possible detriment to

---

[6] The parties in this case do not contend that the trustee or the liquidating trust should be considered as a part of the estate for purposes of sec. 1398 or the use of the estate's or the debtor's tax attributes.

the debtor's opportunity for rehabilitation, without providing any particular benefit to the estate or the estate's creditors.

Our analysis of this matter is focused on the facts before us. On the basis of those facts and in accord with established bankruptcy case precedent, we hold that termination of petitioner's bankruptcy estate occurred at the time of the confirmation of the plan of reorganization. In reaching this holding, we do not attempt to establish a "bright-line rule" under which all chapter 11 bankruptcy reorganizations would "terminate", within the meaning of section 1398(i), at the time of the plan's confirmation. The circumstances of each case should dictate whether a "termination" has occurred.

In prior Memorandum Opinions of this Court, the view was expressed that the phrase "termination of an estate", as used in section 1398(i), should be the same as or compatible with the phrase closing of the estate as used in section 346(i)(2) of the Bankruptcy Code, 11 U.S.C. section 346(i)(2) (2000). See McGuirl v. Commissioner, T.C. Memo. 1999-21; Beery v. Commissioner, T.C. Memo. 1996-464; cf. Firsdon v. United States, 95 F.3d 444, 446 (6th Cir. 1996); Banks v. Commissioner, T.C. Memo. 2001-48, affd. in part, revd. in part and remanded 345 F.3d 373 (6th Cir. 2003); Gulley v. Commissioner, T.C. Memo. 2000-190; Kahle v. Commissioner, T.C. Memo. 1997-91. However, all of those cases either began as chapter 7 liquidations or were converted from

chapter 11 reorganizations to chapter 7 liquidations and are thus distinguishable from the current case.  In addition, the question of whether a "termination" occurred before the closing of the estate was not squarely presented in any of those cases.

Section 346(i)(2) of the Bankruptcy Code, like section 1398, provides for the succession of tax attributes from the estate to the debtor in cases under chapter 7 or 11 of the Bankruptcy Code. Section 346(i)(2) of the Bankruptcy Code provides:  "After such a case is closed or dismissed, the debtor shall succeed to any tax attribute to which the estate succeeded under paragraph (1) of this subsection but that was not utilized by the estate."  11 U.S.C. sec. 346.  Section 346(i)(2) of the Bankruptcy Code is unambiguous and provides for the transfer of tax attributes after the bankruptcy case is closed.  As we have already noted, the term "closed" is well established in bankruptcy parlance.

In Firsdon v. United States, supra, the issue before the court was whether the bankrupt's time for claiming a refund had expired so as to deny the District Court jurisdiction over the bankrupt's refund claim.[7]  The bankrupt relied on section 346(i)(2) of the Bankruptcy Code, which provides for the tolling of limitation periods during the pendency of a bankruptcy case. The Court of Appeals for the Sixth Circuit analyzed section

_____

[7] The limitations question had to be resolved before the District Court could consider the bankrupt's claims to the estate's losses within the context of sec. 1398(i).

346(i)(2) of the Bankruptcy Code and its relationship to section 1398(i).  The Court of Appeals found significant the following language contained in section 346(a) of the Bankruptcy Code: "Except to the extent otherwise provided for in this section, subsections (b), (c), (d), (e), (g), (h), (i), and (j) of this section apply notwithstanding any State or local law imposing a tax, but subject to the Internal Revenue Code of 1986."

The Court of Appeals for the Sixth Circuit reasoned that the phrase "subject to the Internal Revenue Code" in section 346(a) of the Bankruptcy Code contemplated that the Bankruptcy Code sections had no effect on the Federal tax laws, and that subsection (a) applies "'only to state and local laws'".  Firsdon v. United States, supra at 446 (quoting In re Page, 163 Bankr. 196, 197-198 (Bankr. D. Kan. 1994)).  The Court of Appeals also referenced the legislative history and noted that "a potential jurisdictional conflict" existed resulting in a "compromise * * * whereby the tax provisions [of Bankruptcy Code section 346(i)] were made 'inapplicable to Federal taxes,' in the hope that comparable federal provisions would be enacted during the subsequent (96th) Congress."  Id. at 447 (quoting H. Rept. 95-595, at 3 (1977)).  It also explained:

> although I.R.C. sec. 1398(i) follows 11 U.S.C. sec. 346(i)(2) in providing for the succession of a bankruptcy estate's tax attributes for federal tax purposes, it does not contain any of the tolling language found in the second sentence of sec. 346(i)(2). [Id.]

As a consequence, sec. 346(i)(2) remains inapplicable to the federal tax laws, even though it was originally drafted with those laws in mind. [Id.]

The Court of Appeals also pointed out that, while Congress had section 346(i)(2) of the Bankruptcy Code in mind when enacting section 1398(i), Congress drafted section 1398(i) to stand on its own and have distinct differences from section 346(i)(2) of the Bankruptcy Code.

It was not a matter of coincidence that section 346(i)(2) of the Bankruptcy Code and section 1398(i) were enacted approximately 2 years apart. Congress, in the first instance, used the term "closed" in section 346 of the Bankruptcy Code and then chose to use the term "termination" in the subsequent enactment of section 1398. If Congress had intended for tax attributes to pass from a bankruptcy estate to a debtor at the same point in the proceeding under titles 11 and 26 of the United States Code, the term "closed" or "termination" could have been used in both provisions. However, Congress chose not to use the same language, and some distinction may reasonably be drawn from this difference.

Another possible reason for Congress's use of the phrase "termination of an estate" in section 1398(i) was to provide symmetry for use of that phrase in subsection (f) of section 1398. The phrase "termination of the estate" is also used in section 1398(f)(2). Where Congress uses the same term or phrase

in more than one place in the same statutory section, the term or phrase should have the same meaning. See Venture Funding v. Commissioner, 110 T.C. 236, 250 (1998).

The phrase "termination of the estate" in section 1398(f)(2) has been considered in the context of a chapter 7 liquidating bankruptcy. Section 1398(f)(2) provides:

> In the case of a termination of the estate, a transfer (other than by sale or exchange) of an asset from the estate to the debtor shall not be treated as a disposition for purposes of any provision of this title assigning tax consequences to a disposition, and the debtor shall be treated as the estate would be treated with respect to such asset.

The bankruptcy court analyzed whether abandonment of assets of a bankruptcy estate by the trustee triggers tax consequences to the estate in In re McGowan, 95 Bankr. 104 (Bankr. N.D. Iowa 1988). The bankruptcy trustee and the debtor argued that the trustee's abandonment of the property was a disposition for tax purposes and that the tax liability arising from the disposition was the obligation of the estate or the trustee. The trustee and the debtor stood to gain by their argument because there were no assets in the estate and the parties agreed that the trustee would not be personally liable for the taxes of the estate. The Internal Revenue Service and the State of Iowa argued that the abandonment of the assets was a "transfer" of assets from the bankruptcy estate to the debtor pursuant to section 1398(f)(2), and therefore the estate would not have any tax consequences

pursuant to section 346(g)(1) of the Bankruptcy Code.  As a result, the transaction would be a taxable event to the debtor.

The holding in In re McGowan, supra at 107, depended upon the definition of the phrase "termination of an estate".  If the estate had terminated as of the date of the abandonment, then the transaction would have qualified under section 1398(f)(2) as a transfer of assets, nontaxable to the estate.  Otherwise, the transaction would have been a taxable disposition to the estate.  The bankruptcy court recognized, as we have, that the phrase "termination of the estate" is susceptible of differing definitions.  That court held that the definition of "termination of the estate", within the context of section 1398(f)(2), included the termination of the estate's interest in property, including the abandonment of property.

The effect of that holding was to place the tax liability on the debtor.  The court reasoned that it had

> difficulty with the notion that the mere act of abandoning burdensome property creates tax liability for the trustee.  The effect of such a rule could be to place the burden of any taxes arising from such "dispositions" upon the unencumbered assets which might otherwise be distributed to unsecured creditors.  [Id. at 108.]

While the bankruptcy court was concerned that the burden of the tax liability on the debtor could inhibit the debtor's fresh start, in those circumstances, the interests of the creditors were considered to be of higher priority.

A similar result was reached in another opinion rendered by the same bankruptcy judge who had decided In re McGowan, supra. See In re Olson, 121 Bankr. 346 (N.D. Iowa 1990), affd. 930 F.2d 6 (8th Cir. 1991). In affirming the opinion of the bankruptcy court, the Court of Appeals agreed that there should not be differing tax results where bankruptcy property is abandoned during administration or at the closing of the estate.

In the case of In re A.J. Lane & Co., 133 Bankr. 264 (Bankr. D. Mass. 1991), the bankruptcy court also considered the abandonment of property and the related tax consequences under section 1398(f).[8] In that case, the court referenced an Internal Revenue Service Private Letter Ruling that included the Government's position that the phrase "termination of the estate" in section 1398(f)(2) includes termination of the estate's interest in property by virtue of abandonment or exemption.

The court then examined the interplay and design of section 1398(f) and (i) and commented:

---

[8] We have cited In re A.J. Lane & Co., 133 Bankr. 264 (Bankr. D. Mass. 1991), and In re Olson, 121 Bankr. 346 (N.D. Iowa 1990), affd. 930 F.2d 6 (8th Cir. 1991), merely to show that a "termination" may occur at some time other than the closing of a bankruptcy case and that a parallel result is appropriate under subsecs. (f) and (i) of sec. 1398. We recognize that with respect to sec. 1398(f) the courts in In re A.J. Lane & Co., supra, and In re Olson, supra, had differing rationales. The differing rationales, however, have no bearing on the issue we consider. We also note that In re Olson, supra, is a ch. 7 bankruptcy proceeding, whereas In re A.J. Lane & Co., supra, is a ch. 11 proceeding.

> The design of the statute is clear.  The party holding the property, whether the debtor or the estate, is also entitled to any available net operating loss carryover, so that if that party incurs a taxable gain in the disposition of the property he can use the net operating loss carryover to offset the gain.  * * * [Id. at 272.]

The court further reasoned that the intended symmetry of the two subsections warranted that the phrase "termination of the estate" should have the same meaning in the context of subsections (f) and (i) of section 1398.  This would satisfy the congressional intent to place net operating loss deductions with the party that recognizes the gain upon the disposition of the property.[9]

The interpretation that subsections (f) and (i) of section 1398 were intended to cause tax losses to vest with the party recognizing gain on the disposition of property is a reasonable one.  As previously explained, in the context of section 1398,

---

[9] Under sec. 1398, the tax attributes (net operating losses) follow the assets of the debtor and the debtor's bankruptcy estate.  Those parties are expressly contemplated within the context of sec. 1398 and, in particular, subsecs. (f), (g), and (i).  The use of the debtor's or the estate's tax attributes is a limited one and does not extend to unrelated third parties. Congress specifically provided that the bankruptcy estate succeeds to the debtor's tax attributes and that those attributes return to the debtor upon the termination of the estate.  Other entities that may be connected with the bankruptcy estate, such as a liquidating trust for the benefit of creditors, have been found to be separate or unrelated entities for purpose of taxation.  See Holywell Corp. v. Smith, 503 U.S. 47 (1992). Accordingly, when petitioner's bankruptcy estate assets were transferred to the liquidating trust for the benefit of creditors, it was not contemplated that the creditors or the trust for their benefit would succeed to the tax attributes of petitioner/debtor or his estate.

that concept does not extend beyond the debtor and the bankruptcy estate. In the setting of this chapter 11 bankruptcy, gains and losses of the debtor and/or the estate would vest with the appropriate party if "termination" occurred at the time of confirmation.

We hold that the concept of closing an estate, as used in section 346 of the Bankruptcy Code, is not identical for all purposes to the phrase "termination of an estate" as used in section 1398. To the extent that the rationale or holding of McGuirl v. Commissioner, T.C. Memo. 1999-21, or Beery v. Commissioner, T.C. Memo. 1996-464, indicates otherwise, it is distinguished.

IV. Petitioner's Use of the Net Operating Losses

Having decided that the tax attributes of the bankruptcy estate transferred to petitioner upon the confirmation of the plan of reorganization, we now address the parties' disagreement over which, if any, net operating losses (NOLs) are available to petitioner and the years to which they may be carried. In this motion for partial summary judgment, the parties are focused on generalized threshold legal questions.[10] Those questions concern whether petitioner may apply losses acquired from his bankruptcy estate upon its termination against his nonbankruptcy income

---

[10] The parties have not addressed the specifics of the losses, such as the amounts available and the mechanics of application under sec. 172.

recognized during 1995, 1996, and 1997 (during the pendency of the bankruptcy proceeding).[11]

Petitioner contends that he is entitled to $136 million in NOLs and $440 million in capital losses from years before and after the commencement of the bankruptcy. Petitioner's contentions present two questions with respect to the application of the losses to his 1995, 1996, and 1997 nonbankruptcy income, which petitioner would have earned during the pendency of the bankruptcy. One question concerns NOL deductions that arose before the commencement of the bankruptcy and are succeeded to by the bankruptcy estate, after which any unused losses are returned to the discharged debtor. The other question involves circumstances where the NOL deduction arises in the bankruptcy estate. In that regard, the question is whether the debtor can use the estate's losses, succeeded to by the debtor, with respect to the debtor's nonbankruptcy income recognized after the commencement and before the termination of the bankruptcy.

Respondent argues that petitioner is entitled to carry forward qualified NOLs only to years occurring after the

---

[11] Petitioner's income tax deficiencies for 1995, 1996, and 1997 are based on respondent's determination that petitioner received compensation/income from his bankruptcy estate for each year. Petitioner contends that the amounts received were nontaxable proceeds of loans, and respondent contends that the amounts were compensation or otherwise taxable income. We note that petitioner's bankruptcy commenced on Feb. 23, 1995, and terminated (upon confirmation and discharge) on Aug. 31, 1997.

bankruptcy termination (the year in which petitioner succeeded to the NOLs from the bankruptcy estate). Petitioner argues that he may apply losses of the bankruptcy estate that he succeeded to at confirmation to any year after the commencement of the bankruptcy (1995 and later). Petitioner also argues that he may apply his own prebankruptcy NOLs, to the extent not used by the bankruptcy estate, to his tax years following the commencement of the bankruptcy.

Section 1398 was enacted to provide rules relating to the Federal tax regimen to be used in connection with individuals' chapter 7 or chapter 11 bankruptcies under title 11, U.S.C. See sec. 1398(a). Section 1398, among other matters, addresses questions concerning which entity is to recognize income and when either entity may succeed to the tax attributes of the other. Ultimately, the question we consider is whether the estate becomes the preeminent or sole taxpayer (to petitioner's exclusion) for purposes of application of NOLs to income for years occurring during the bankruptcy proceeding. At the commencement of the bankruptcy, the estate becomes a taxable entity treated as an individual taxpayer with respect to the computation of income from assets being administered in the estate under title 11, U.S.C. The debtor continues as a separate taxable entity during the pendency of the bankruptcy, with respect to income that the bankruptcy estate is not entitled to

under title 11, U.S.C.

Under section 1398(g), the estate succeeds to certain of the debtor's income tax attributes, including the debtor's NOL carryovers (under section 172) and capital loss carryovers (under section 1212) from tax periods prior to the commencement of the bankruptcy. Sec. 1398(g)(1), (5). In a like manner, to the extent the estate has not used those same tax attributes, the debtor succeeds to them at the termination of the estate. Sec. 1398(i). Accordingly, upon the commencement of a bankruptcy, the estate becomes a taxpayer with respect to the debtor's property in the bankruptcy proceeding. Upon termination of the estate, the estate's status as a separate parallel taxpayer ends and its unused tax attributes transfer to the debtor. Id.

Although a debtor may succeed to the estate's NOLs at the termination of the estate, section 1398(j)(2)(B) places certain limitations on a debtor's ability to use NOLs. Section 1398(j)(2)(B) provides the following rules with respect to net operating losses: "The debtor may not carry back to a taxable year before the debtor's taxable year in which the [bankruptcy] case commences any carryback from a taxable year ending after the case commences." This section expressly prohibits a debtor from carrying back the estate's or the debtor's postcommencement

losses to prepetition taxable years.[12]  We note that section

1398(j)(2)(B) applies with respect to "any carryback from a

taxable year ending after the case commences."  The use of the

all-inclusive adjective "any" in section 1398(j)(2)(B) would be

inclusive of the estate's NOLs that are succeeded to by the

debtor.  Accordingly, section 1398(j)(2)(B) prohibits only

carrybacks to precommencement years and does not place any

limitation on postcommencement years.[13]

The use of the bankruptcy commencement date in section

1398(j)(2)(B), to demarcate the earliest year to which a loss may

be carried back as well as the earliest year from which such a

loss may emanate, appears to favor petitioner's position that he

may carry forward the NOLs received from the bankruptcy estate to

postcommencement years (1995 and forward).  The purpose of

section 1398 is achieved during the bankruptcy by causing the

estate to be responsible for income attributable to assets which

are part of the bankruptcy estate.  In that regard, the debtor is

---

[12] No reference is made in sec. 1398(j)(2)(B) to the carryback of precommencement NOLs to precommencement years. Whether such a carryback is permitted is not a matter that need be decided with respect to the factual circumstances presented in this case.

[13] We recognize that sec. 1398(g)(1) uses the word "carryovers" in describing the attributes to which the debtor may succeed, but the operative language, as discussed above, indicates that the use of the word "carryovers" was not intended as a limitation.  Rather, the word "carryovers" appears to reference the movement of the attribute from the estate to the debtor.

responsible for the income tax attributes for any assets that the debtor retains outside of the bankruptcy proceeding. In effect, the statute creates two separate, but parallel, taxpayers during the bankruptcy estate, followed by the recombination of both their attributes into one upon the estate's termination.[14] Significantly, with respect to the tax attributes, the debtor/taxpayer is the predecessor to and successor of the bankruptcy estate.

The parties agree that section 1398 permits a debtor to carry forward either losses sourced in tax years prior to the bankruptcy commencement or losses which the debtor acquired from the estate. The dispute concerns whether the losses may be carried forward from the commencement of the bankruptcy proceeding or are limited to the period beginning with the termination of the estate. So, for example, we consider whether petitioner may carry forward his own prebankruptcy NOL, to the extent not used or absorbed by the estate, to his 1995, 1996, and/or 1997 tax years. This matter is further complicated by the two parallel but separate taxpayers (estate and debtor) for the 1995, 1996, and 1997 tax years. Ultimately, the question is whether the bankruptcy estate becomes the preeminent or sole taxpayer (to petitioner's exclusion) for purposes of carryforward

---

[14] We note that only the estate is expressly permitted to carry back losses to precommencement years during the bankruptcy. Sec. 1398(j)(2)(A).

of pretermination NOLs to the bankruptcy years; in other words, whether petitioner is limited to posttermination (1997 and later) year carryforwards because of the estate's application of the debtor's precommencement losses and the estate's losses to any of the debtor's precommencement and the estate's postcommencement income.  Although the statute expressly prohibits carrybacks by the debtor with respect to years before the commencement of the bankruptcy, there is no such limitation with respect to carryforwards to postcommencement years.

Because of the parallel treatment on the income side of the equation (requiring the debtor and the estate to report only the income to which each is entitled), it follows that the debtor's precommencement and the estate's losses, to the extent not fully absorbed during the bankruptcy years, should be applied to any parallel income of the debtor during those same years.  Although the ordering of such losses (computation and application) could become complex, it is, nevertheless, appropriate.  There is nothing in section 1398 which would prohibit such treatment.[15] Indeed, the approach of section 1398 regarding the income side would seem to promote this result with respect to the losses.  If a debtor were unable to apply post- or pre-bankruptcy losses to

_____

[15] Other than the limitation on the debtor's ability to apply carrybacks to prebankruptcy years, sec. 1398 does not provide any rules or limitations as to the calculation or use of carrybacks or carryovers of NOLs.  Sec. 1398 references sec. 172 for such matters.

reduce the debtor's nonbankruptcy income realized during the bankruptcy, those losses might never be used.[16] It is unlikely that such a result was intended.

We must, however, also consider section 172, which defines the key terms and provides for the computations of net operating losses, carrybacks, and carryforwards. Subsections (g)(1) and (i) of section 1398 each provide that a debtor succeeds to loss carryovers under section 172. Section 172(a) allows a deduction for the taxable year of "an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year." The allowable carryback and carryforward periods for the taxable years at issue are 3 years and 15 years, respectively. See sec. 172(b).[17]

Section 172(b)(2), in pertinent part, provides:

Amount of carrybacks and carryovers.--The entire amount of the net operating loss for any taxable year * * * shall be carried to the earliest of the taxable years to which * * * such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried.

---

[16] The losses could be carried forward, but may be lost if subsequent years' gains are insufficient to absorb the losses.

[17] The amendments to sec. 172 by the Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1082(a)(1) and (2), 111 Stat. 950, revised the allowable carryback and carryforward periods to 2 and 20 years, respectively. These amendments do not apply to petitioner's 1995 and 1996 tax years because the amendment is effective for years after Aug. 5, 1997.

Section 1.172-1(b), Income Tax Regs., also describes the steps to be taken to ascertain an NOL deduction for a given taxable year. It describes NOL carryovers from "preceding taxable years" and NOL carrybacks from such "succeeding taxable years". An NOL deduction from any given year maintains its character of arising in that year when carried back or carried forward. See sec. 1.172-6, Income Tax Regs. In addition, section 1.172-4(a)(3), Income Tax Regs., provides:

> The amount which is carried back or carried over to any taxable year is the net operating loss to the extent it was not absorbed in the computation of the taxable (or net) income for other taxable years, preceding such taxable year, to which it may be carried back or carried over.

Section 172, therefore, requires that the losses be carried back and forward in a certain order and places outer limits on the years to which the losses may be applied. The regimen of section 172 also provides that the year from which the loss emanates does not change. Therefore, losses acquired by the estate or acquired or reacquired by the debtor would be time limited according to the source year of the loss.

Accordingly, sections 1398 and 172 do not circumscribe petitioner's ability to carry forward prepetition NOLs that he succeeded to from the bankruptcy estate. This view is supported in the following dicta:

> Any remaining NOL belonging to the estate will be returned to the debtor-taxpayer after the discharge in bankruptcy and termination of the estate. Sec.

1398(i).  The debtor is then free to use the NOL as a
carryforward, section 1398(i), or carryback, as long as
the NOL arose before the commencement of the bankruptcy
case, section 1398(j)(2)(B).  [Kahle v. Commissioner,
T.C. Memo. 1997-91.]

See also McGuirl v. Commissioner, T.C. Memo. 1999-21.

Petitioner argues that he succeeded to NOLs that were
incurred by the operation of the bankruptcy estate and that
section 1398(j)(2)(B) limits only his ability to carry back such
NOLs to his taxable years that preceded the commencement of his
bankruptcy case.  Thus, he argues, he may use the NOLs in
postcommencement tax years.  We agree with petitioner that the
losses succeeded to from the estate may be used, to the extent
permitted in section 172, in the debtor's taxable years beginning
with the year in which the bankruptcy commenced.

Some commentators have drawn an analogy between section
1398(g) and (i), and section 642(h), which governs the
availability of a trust's or estate's unused loss carryovers to
the beneficiaries.  In section 642(h) it is clear that a
beneficiary may only carry forward the trust's or estate's unused
loss carryovers beginning with the year the trust or estate
terminates.  The analogy was likely drawn because of the
acquisition of a trust's or estate's tax losses upon the
termination of the trust or estate.  The analogy diminishes in
significance, however, because of an important distinction
between the section 642(h) situation and the section 1398

situation we consider in this case.  In the section 642 setting, the estate or trust and the beneficiary are wholly separate taxpayers, and a carryback to years before the commencement of the estate or trust would not be a logical extension of the succession concept in that setting.  Conversely, a bankruptcy estate subsists as a parallel portion of the same taxpayer, the debtor.  The bankruptcy estate is allowed to use the debtor's precommencement losses to offset any portion of the estate's income during the bankruptcy proceeding.  Upon the termination of the bankruptcy estate, the losses of the bankruptcy estate received by the debtor may, in part, include the debtor's precommencement losses.  Those differences make inappropriate any attempt to draw an analogy between section 1398(g) and (i), and section 642(h).[18]

The parties have not provided any precedent or in-depth and consequential deliberation concerning the question we consider. Although a few cases have peripherally focused on this question, no analysis or legislative history exists from which guidance may prudently be sought.  Respondent referenced a few commentators' prognoses of how losses from a bankruptcy would be treated. Those commentaries are terse and contain no analysis, policy

---

[18] As previously explained, sec. 1398 contemplates the use of the debtor's tax attributes by the bankruptcy estate and their return to the debtor upon the termination of the estate.  This same reasoning distinguishes the analogy to sec. 642(h).

considerations, or precedents in support of the comments or conclusions reached.[19]  Accordingly, we place no reliance on these extraneous offerings.

We therefore hold that petitioner is entitled to carry forward losses inherited from the bankruptcy estate and those to which the debtor was already entitled in accord with section 172 and the underlying regulations.  Those losses may be applied, in accord with the provisions of section 172, for the year of the commencement of the bankruptcy and later years.

V.  CBM and Bankruptcy Estate Payments to Petitioner

Petitioner argues that the more than $2 million in payments received from CBM were dividends or profits to the Benton estate on account of its ownership of shares in CBM.  Petitioner further asserts that the payments from CBM and a $25,000 payment he received from the Benton estate constituted loans to him from the Benton estate.  Finally, petitioner contends that the loans were discharged as part of the plan and nontaxable to him pursuant to section 108(a)(1)(A).

Respondent argues that petitioner received the payments from CBM and the Benton estate as compensation under a claim of right without restriction as to disposition.

----

[19] McQueen & Williams, Tax Aspects of Bankruptcy Law and Practice, sec. 18-23 (2d ed. 1995); Newton & Bloom, Bankruptcy and Insolvency Taxation, sec. 2.16 (John Wiley & Sons, 1991); Tatlock, Discharge of Indebtedness, Bankruptcy, and Insolvency, 540-2d Tax Mgmt. (BNA), at A-37 (2003).

Upon a careful review of the record and analyzing factual inferences in a manner most favorable to the party opposing summary judgment, we conclude that genuine issues of material fact exist relating to this issue.  See <u>Dahlstrom v. Commissioner</u>, 85 T.C. at 821.  Accordingly, summary judgment is inappropriate with respect to this issue.

<u>An appropriate order will be issued</u>.